1   DONALD AMAMGBO, ESQ.
    AMAMGBO & ASSOCIATES
2   7901 Oakport Street, Suite 4900
    Oakland, California 94621
3   Telephone:  (510) 615-6000
    Facsimile:   (510) 615-6025
4
5   REGINALD TERRELL, ESQ.
    THE TERRELL LAW GROUP
6   223 25th Street
    Richmond, California 94804
7   Telephone:  (510) 237-9700
8   Facsimile:   (510) 237-4616

9

10  Attorneys for Plaintiff
                                                        E-filing
11

12                    IN THE UNITED STATES DISTRICT COURT

13

14            IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                                              Case No.:    C08-00662 JSW

16  Dennis Patrick, a California resident, on behalf      **CLASS ACTION COMPLAINT**
    of himself and all others similarly situated,
17                                                         JURY TRIAL DEMANDED
                    Plaintiff,
18
         vs.
19

20  CHUNGHWA PICTURE TUBES, LTD.; LP
    DISPLAYS INTERNATIONAL, LTD.;
21  MATSUSHITA ELECTRIC INDUSTRIAL
    CO., LTD.; KONINKLIJKE PHILIPS
22  ELECTRONICS NV; SMASUNG SDI CO.;
    TOSHIBA CORP.; TOSHIBA AMERICA
23  INC.
24
                    Defendants.
25
         Plaintiff Dennis Patrick on behalf of himself and the classes defined below ("Plaintiff"),
26
    by and through his attorneys, brings this civil action for damages and injunctive relief against the
27
    above-named defendants, and demands a trial by jury complains and alleges the following:
28

1

I.    **INTRODUCTION**

2    1. This case arises out of a long-running conspiracy extending from at least May 1, 1998

3 through November 9, 2007 (the "class period") among defendants and their co-conspirators, with

4 the purpose and effect of fixing, raising and or maintaining the prices for cathode ray tubes

5 ("CRTs") sold indirectly to Plaintiff Patrick and the class of purchasers he seeks to represent

6 herein.

7    2. CRTs are used in a number of products, including but not limited to, televisions and

8 computer monitors. Throughout the class period, defendants' conspiracy was intended to, and

9 did, moderate the downward pressure on CRTs (and, because products containing CRTs caused

10 by the rapidly increasing popularity of flat panel products using liquid crystal displays ("LCD")

11 and plasma display panels ("PDP") (collectively, "FPD").

12    3. Defendants and their co-conspirators formed an international cartel to illegally restrict

13 competition in the CRT market, targeting and severely burdening indirect-purchasers in the

14 United States. During the class period, defendants' conspiracy affected billions of dollars of

15 commerce throughout the United States. Because of this conspiracy, Plaintiff Patrick and other

16 indirect-purchasers have been injured by paying more for CRTs than they otherwise would have

17 paid in the absence of defendants' conspiracy.

18    4. Plaintiff brings this action seeking federal injunctive relief pursuant to Section16 of the

19 Clayton Act, 15 U.S.C. § 26 for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to

20 recover damages under state antitrust, consumer protection, unfair trade and or deceptive trade

21 practices laws, common law principles of restitution, disgorgement, unjust enrichment and to

22 recover the costs of suit, including reasonable attorneys fees, for the injuries Plaintiff Patrick and

23 the class members sustained because of the defendants' conspiracy to fix, raise, maintain and or

24 stabilize the price of CRTs.

25

II.    **JURISDICTION AND VENUE**

26    5. This court has subject matter jurisdiction of the federal antitrust claims asserted in this

27 action pursuant to Section16 of the Clayton Act, (15 U.S.C. § 26) and Title 28 United States

28 Code Sections 1331 and 1337 and Section 1 of the Sherman Act (15 U.S.C. § 1). This court has

1  subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United
2  States Code Section 1332 (d) and 1367, because the amount in controversy exceeds the sum of
3  $5,000,000.00 exclusive of interest and costs, Plaintiff Patrick and the class members are citizens
4  of states different from defendants, and certain defendants are citizens and or subjects of foreign
5  states.

6      6. Venue is proper in this district pursuant to 15. U.S. C § 22 and 28 U.S.C § 1391, because
7  one or more of the defendants reside in, is licensed to do business, or is found and or transacts
8  business in this district, and a substantial part of the events and or omissions giving rise to
9  plaintiff's claims arose in this district.

10     7. Defendants conduct business throughout the United States, including in this jurisdiction,
11  and they have purposefully availed themselves of United States laws, including the laws of the
12  individual states listed herein. Defendants' products are sold in the flow of interstate commerce,
13  and their activities have a direct, substantial and reasonably foreseeable effect on such
14  commerce.

15     8. The activities of the defendants and their co-conspirators described herein substantially
16  affected commerce throughout the United States including each of the states identified herein
17  because defendants, directly and or through their agents engage in activities affecting each such
18  state. Defendants purposefully availed themselves of the laws of each of the states identified
19  herein relating to the production, marketing and or sale of CRTs. Defendants produced,
20  promoted, sold, marketed and or distributed CRTs, thereby profiting from access to indirect-
21  purchaser/end-user businesses and other consumers in each state identified herein. Defendants
22  also contracted to supply and or obtain goods and or revenue related to the business for CRTs.
23  Because of the activities described herein, defendants:

24              a. Caused damage to the residents of the states indentified herein;
25              b. Caused damage in each of the states indentified herein by acts of
26                 omissions committed outside each such state by regularly doing and or
27                 soliciting business in each such state;

28

c. Engaged in persistent courses of conduct within each such state and or derived substantial revenue from the marketing of CRTs and or the products in which they are used in each such state and services relating to such marketing; and

d. Committed acts and or omissions that they knew and or should have known would and did in fact cause damage in each such state while regularly doing and or soliciting business in each such state, engaging in other persistent courses of conduct in each such state and or deriving substantial revenue from the marketing of CRTs and or the products in which they are used in each such state.

9. The conspiracy described herein affected adversely every person nationwide and in each of the states identified in this complaint who indirectly bought defendants' CRTs. Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers in each state identified herein.

10. Prices of CRTs can be manipulated by conspirators within the state, outside of them and or both. Without enforcing the antitrust and or consumer protection laws of each of the states identified herein, the companies that break the law will go unpunished. Defendants' knew that commerce in each of the states identified herein would be adversely affected by implementing their conspiracy.

### III    THE PARTIES

#### A.    The Plaintiff

11. Dennis Patrick a resident of California indirectly purchased products containing CRT from one or more defendants during the class period and was injured because of defendants' illegal conduct.

#### The Defendants

12. Defendant Chunghwa Picture Tubes Ltd. ("Defendant Chunghwa") is a Taiwan business entity with its principal place of business at 1127 Heping Rd, Bade City, Taoyuan,

1  Taiwan, 334. During the class period, Defendant Chunghwa manufactured, marketed, sold and
2  or distributed CRTs to consumers throughout the United States.

3      13. Defendant LP Displays International, Ltd., f/k/a. LG Philips Displays, Ltd.,
4  ("Defendant LP") is a Hong Kong business entity with its principal place of business at 6th
5  Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. During the class
6  period, Defendant LP manufactured, marketed, sold and or distributed CRTs to consumers
7  throughout the United States.

8      14. Defendant Matsushita Electric Industrial Co., Ltd., (d/b/a. "Panasonic"), ("Defendant
9  Panasonic") is a Japanese business entity with its principal place of business at 1006, Kadoma,
10  Kadoma City, Osaka 571-8501 Japan. During the class period, Defendant Panasonic
11  manufactured, marketed, sold and or distributed CRTs to consumers throughout the United
12  States.

13      15. Defendant MT Picture Display Co., Ltd., (f/k/a. Matsushita Toshiba Picture Display
14  Co.), a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd with its principal
15  place of business at Takatsuki-shi, Osaka, Japan. MT Picture Display Co. was formerly owned
16  and controlled by both defendants Matsushita and Toshiba Corp. until earlier this year, when
17  Toshiba Corp. sold its share of the business. During the class period, Defendant MT
18  manufactured, marketed, sold and or distributed CRTs to consumers throughout the United
19  States.

20      16. Defendant Koninklijke (Royal) Philips Electronics NV, ("Defendant Royal") is a
21  Dutch business entity with its principal place of business at Breitner Center, Amselplein 2, 1096
22  BC Amsterdam, The Netherlands. During the class period, Defendant Royal manufactured,
23  marketed, sold and or distributed CRTs to consumers throughout the United States.

24      17. Defendant Samsung SDI Co., ("Defendant Samsung") is a South Korea business
25  entity with its principal place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi,
26  South Korea. During the class period, Defendant Samsung manufactured, marketed, sold and or
27  distributed CRTs to consumers throughout the United States.

28

19. Defendant Toshiba Corp. ("Defendant Toshiba ") is a Japanese business entity, with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the class period, Defendant Toshiba manufactured, marketed, sold and or distributed CRTs to consumers throughout the United States.

19. Defendant Toshiba America, Inc., ("Defendant Toshiba America") is a wholly-owned business subsidiary of Toshiba Corp., and has its principal place of business at 1251 Avenues of the Americas, New York, NY. During the class period, Defendant Toshiba America manufactured, marketed, sold and or distributed CRTs to consumers throughout the United States.

### B. **Co-Conspirators**

20. Various persons and entities, whose identities are at this time unknown to plaintiff, participated as co-conspirators in the violations alleged herein and performed acts and or made statements in furtherance thereof. When plaintiff learns the identities of such co-conspirators, plaintiff will seek leave to amend this complaint to add such co-conspirators as defendants.

21. The acts charged in this complaint have been done by defendants and their co-conspirators, or were authorized, ordered and or done by their respective officers, agents, employees and or representatives while actively engaged in the management of each defendant's business and or affairs.

22. Each of the defendants named herein acted as the agent of joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs made by its parent company.

### IV    **FACTUAL ALLEGATIONS**

#### A. **CRT Technology**

23. CRT is a widely used technology utilized in products such as TVs and computer monitors that allow devises to display images upon the screen.

24. Known for their brightness, resolutions, rich colors, contrast, and reliability CRTs evolved from early black-and-white TV sets and monitors to today's high-resolution, digital-

1   ready graphic models. The basic components of a CRT are (a) A heated, cylindrical cathode, or

2   electron gun that emits a steady stream of electrons; (b) A shadow mask that directs the electron

3   beams, (c) A phosphor-coated screen that absorbs the beams, (c) A deflection yoke that directs

4   the scanning electron beam, which strikes the screen to produce light; and (d) An evacuated glass

5   envelope that allows the entire process to take place in a vacuum.

6       25. CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 27 inch,

7   and 23 inch and they are commodity products that is those manufactured by defendants are

8   interchangeable.

9       **B. The CRT Market**

10      26. CRTs have no independent utility, and thus have value only as components of other

11  products, primarily televisions and computer monitors. Direct purchasers buy CRTs to include

12  them as components in televisions and computer monitors. The demand for CRTs thus directly

13  derives from the demand for televisions and computers monitors.

14      27. The market for CRTs and the market for the products into which they are placed are

15  inextricably linked and intertwined because the CRT markets exist to serve the CRT products

16  markets. The market for CRT and the markets for the products in which CRTs are placed are,

17  for all intents and purposes, inseparable in that one would not exist without the other.

18      28. The largest direct purchasers of CRTs are television and computer OEMs.

19  Significantly, some of the defendants herein are and or were, during the class period also CRT

20  television and or computer OEMs, such as Toshiba Crop. and Samsung SDI and or their parent

21  corporations.

22      29. Plaintiff and the indirect purchaser class members have participated in the market for

23  CRTs through their purchases of products containing CRTs. To the extent Plaintiff Patrick and

24  the indirect purchaser class members bought CRTs as part of a television and or computer

25  monitor, defendants' unlawful conspiracy inflated the prices at which OEMs resold such

26  products.

27      30. The market for CRTs in the United States is and remains extremely large. In 1997,

28  the worldwide CRT market exceeded $24 billion. In 2006, industry experts established that

1  televisions containing CRTs made up at least half of all of the projected 29,000,000 televisions
2  shipped to North America that year.

3      31. Nonetheless, while CRTs were once the dominant display screen technology used in
4  television and computer monitors, the market for CRT televisions and computer screens has been
5  in decline during the class period, due to the increased demand for FPD products which are used
6  in place of CRT models.

7      32. FPD products such as televisions and computer monitors first began competing with
8  CRT models in the 1990s. By 1998, FPD products had taken over approximately 35% of the
9  market for televisions and computer monitors.

10     33. While priced much higher than televisions and computer screens using CRTs, FPDs
11 offered benefits to businesses and consumers unavailable in CRT models. Televisions using
12 FPD technology offer smaller dimensions, increased aperture ratios, higher brightness, and lower
13 power consumption. Computers using FPD technology offer greater mobility due to their
14 smaller size, and lower power consumption.

15     34. Despite the high difference in price between televisions and computer screens using
16 CRTs and those using FPD technology, throughout the class period, the percentage of televisions
17 and computer screens purchased in the United States using FPD technology increased
18 dramatically, while the percentage of those utilizing CRTs fell.

19     35. CRT televisions currently account for only approximately 40% of television sales
20 revenues in the United States. Industry experts have predicted that by 2008, CRT screen
21 shipments will constitute only approximately 25% of the total televisions shipments in North
22 America, while LCD screen shipments will compromise over 50% of the total shipments.

23     C.    **Structure Features Of The CRT Industry**

24     36. The CRT industry is characterized by a number of structural features which facilitate
25 collusion.

26     37. First, there is significant market concentration. The increase in the popularity of
27 FPD products caused many CRT manufactures to exit the market during the class period. This
28 caused increased consolidation and concentration in the CRT manufacturing industry.

1  38. During the class period, the defendants collectively owned the majority of the market
2  share for CRTs used in televisions and computer monitors.

3  39. Defendant Samsung SDI is currently the largest manufacturer of products containing
4  CRTs. In 2004, it held approximately a 30% share of the global CRT market.

5  40. Defendant LP Displays currently has the second largest share of the global CRT
6  market. In 2004, it held approximately a 27% share of the global CRT market.

7  41. Defendant MT Picture Display held approximately a 9% share of the global CRT
8  market in 2004.

9  42. Defendant Chunghwa Picture Tubes held approximately a 6.9% share of the global
10 CRT market in 2005.

11 43. There are also significant barriers to entry in the CRT industry in the form of high
12 manufacturing and technological barriers. Construction and maintenance of fabrication plants is
13 extremely expensive. Because of increased competition and ongoing technological advances,
14 manufactures' research and development expenses are also extremely high.

15 44. There are also multiple interrelated business relationships in the CRT industry. For
16 example, in November of 2000, defendants LG Electronics and Koninklijke Philps Electronics
17 agreed to enter into a joint venture that combined their CRT manufacturing operations. The
18 resulting company, LG Philips Displays, now known as LP Displays, entered the market with a
19 25% share in the global CRT market.

20 45. Defendants Matsushita Electric Industrial Co., Ltd. And Toshiba Corporation also
21 entered into a joint venture combining their CRT manufacturing operations during the class
22 period. The resulting company, MT Picture Display Co., immediately enjoyed a significant
23 share of the global CRT market.

24 46. And in 2005 approximately, defendants Samsung SDI and LG Philips Display
25 entered into an agreement to work together by sharing components with respect to CRTs.

26 **D.  The Defendants' Illegal Conspiracy**

27 47. The price of CRTs during the class period did not fully reflect the sharp decline in
28 demand for CRTs caused by the entry of the new generation of competing technologies. Despite

CLASS ACTION COMPLAINT - 9

the introduction of technologically superior and increasingly popular alternatives to televisions and monitors using CRTs, the price of CRTs remained unnaturally high throughout the class period, with periods of sustained and unnatural price stability.

48. The concentration of CRT manufacturers, the declining CRT share of the total market for televisions and computer screens, and the higher price of FPD Product gave defendants the means and incentive to conspire and collude to artificially fix, maintain and or stabilize the prices at which CRTs were sold.

49. During the class period, defendants and their co-conspirators agreed, combined, and conspired artificially to raise, maintain, and stabilize the prices at which CRTs were sold directly and indirectly in the United States at artificial levels. This illegal combination was effectuated by means of illegal contracts, agreements, or secret negotiations between defendants through their officers, directors and employees.

50. For example, despite falling demand and increased use of FPD technology in televisions and computer monitors, defendants increased the prices of CRTs sold in February of 2002 and at other points of time throughout the class period. This price increase was the result of an agreement among defendants to collectively raise the prices of CRTs.

51. Defendants also agreed to fix, maintain and or stabilize the price of CRTs by collectively agreeing to reduce the production of CRTs through plant closures and work slowdowns.

52. This conspiracy resulted in unnaturally higher prices for CRTs which were fundamentally inconsistent with the low demand for them and their rapidly approaching obsolescence.

**E.     International Antitrust Investigations**

53. On or about November 8, 2007, government agencies from Japan, South Korea, the European Union and the United States each opened coordinated investigations into CRT manufactures based on a suspicion that they formed an international price cartel to fix the prices for CRTs.

1    54. On or about November 8, 2007, news reports stated that CRT manufactures are
2    "suspected of holding meetings to discuss the price targets in Southeast Asia countries where
3    CRT manufacturing bases are located." Another stated that "[t]he CRT manufactures are
4    suspected of operating an international cartel since 2005 or earlier."

5    55. On or about November 8, 2007, defendant Matsushita Electric Industrial Company
6    confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this
7    international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted
8    that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display
9    Company's offices in Japan. Up until earlier this year, MT Picture Display was formerly owned
10   by Toshiba Corp. and defendant Matsushita Electric Industrial Company.

11   56. On or about November 8, 2007, defendant Samsung SDI confirmed that South
12   Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international
13   price-fixing investigation.

14   57. On or about November 8, 2007, news reports stated that defendant LP Displays was
15   visited by antitrust regulators as part of this international price-fixing investigation.
16   On or about November 12, 2007, defendant Chunghwa Picture Tubes admitted that the company
17   had received a summons from the United States Department of Justice ("DOJ") as part of this
18   international price-fixing investigation.

19   58. On or about November 21, 2007, defendant Royal Phillips Electronics admitted that
20   the company is subject to this international price-fixing investigation.

21   **F.    The Pass-Through Of The Overcharges To End-Users**

22   59. OEMs and retailers of televisions and monitors containing CRTs are all subject to
23   vigorous price competition. Televisions and computers are commodities, with little or no brand
24   loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to
25   different brands. Televisions and computers prices are closely based on production costs, which
26   are in turn directly determined by component costs, as assembly costs are minimal. OEMs
27   accordingly use component costs, like the cost of CRTs, as the starting point for all price

28

calculations. Television and computer monitor prices thus closely track increases and decreases in component costs.

60. Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial levels resulted in harm to Plaintiff Patrick and the indirect-purchaser classes alleged herein because it resulted in them paying higher prices for televisions and monitors containing CRTs than they would have in the absence of defendants' conspiracy. The entire overcharge for CRTs at issue was passed on to Plaintiff Patrick and members of the indirect-purchaser class.

61. An increase in the cost of purchasing a CRT significantly affects the price of television or computer monitors using CRTs.

62. CRTs account for a significant percentage of the overall cost of televisions or computer monitor. For example, CRTs account for approximately thirty (30) percent of the cost of manufacturing a television set.

63. CRTs are commodity products, with functionally equivalent products available from the defendants, which manufacture them pursuant to standard specifications and sizes. Because OEMs and retailers have thin net margins, they must pass on any increase in component costs, such that increased in the price of CRTs lead to quick corresponding price increased at the OEM and retail level for products coating CRTs.

64. Thus, all supra-competitive overcharges are always passed through to the indirect-purchaser, end-user plaintiff class members, which pay more for televisions and monitors coating CRTs than in a competitive market place.

G. **<u>The Pass-Through Of The Overcharges To End-Users</u>**

65. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distributions system. CRTs are identifiable, discreet physical objects that do not change form or become an indistinguishable part of TVs or computer monitors.

66. Thus, CRTs follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating the CRT.

67. Moreover, just as CRTs can by physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect prices paid by indirect purchaser class members of televisions and monitors containing CRTs.

68. Because defendants control the market for CRTs, there are virtually no choices for persons and businesses that require products containing such products other than buying such products manufactured by a direct purchaser that paid supra-competitive prices for CRTs to defendants because of defendant's conspiracy alleged herein.

69. When distribution markets are highly competitive, as they are in the case of televisions and monitors containing CRTs, all of the overcharge will be passed through to ultimate end user businesses and consumers, such as the indirect-purchaser Plaintiff Patrick and class members. In addition, most of the defendants themselves manufacture, market, and distribute televisions and monitors containing CRTs. This means that these defendants will pass through to their customers 100% of the supra-competitive price increases that result from the defendants; conspiracy, combination, and agreement to fix, increase, and stabilize the prices for CRTs.

70. Hence, the inflated prices of televisions and monitors containing CRTs resulting from defendants' price-fixing conspiracy have been passed on to Plaintiff Patrick and the other class members by direct purchasers.

71. During the class period, a number of large OEMs sold televisions and monitors containing CRTs directly to end-buyers. For example, the OEM with the largest share of computer monitor sales in the United States market, Dell, sold exclusively to end-buyers, and did Gateway. During the class period, Compaq and Apple also sold large portions of their computer monitors directly to the end buyer.

72. Computer models sold by other OEMs to retailers were generally updated several times a year, and the price was changed for each new model. For example, for on large retailer, more than 90% of the computers sold during 2000 were either new models or were sold at a different price from the price in the previous month. OEMs, retailers and distributors often use a "standard markup" method to set prices, meaning that they add a standard percentage to their

CLASS ACTION COMPLAINT - 13

own costs to determine selling prices. Thus, changes in the price of CRTs were passed on rapidly rather than absorbed.

73. In retailing, it is common to use a "markup rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller for computer monitors, uses such a system, and a declaration in the DRAM case from CDW; director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product... CDW... adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

74. The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hoverkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer because of the monopoly price at the top. Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

75. Similarly, two other antitrust scholars –Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan

(Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

76. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

77. The purpose of the conspiratorial conduct of the defendants was to raise, fix or stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors containing CRTs. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variable are explained by changes in a multitude of variables--- when all such variables may be changing simultaneously. That analysis-called regression analysis is- commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of CRTs on prices for televisions and monitors containing CRTs even though such products contain a number of other components whose prices my be changing over time. A regression model can explain how variation in the price of CRTs affects changes in the price of televisions and monitor containing CRTs. IN such models, rather than being treated as the dependent variable, the price of CRTs is treated as an independent or explanatory variable. The model can isolate how changes in the price of CRTs impact the price of televisions and monitors containing such CRTs while holding controlling for the impact of other price-determining factors.

78. Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected

costs refers to whether an overcharge affects a direct (*i.e. variable*) cost or an indirect (i.e. overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

79. Other factors that lead to the pass-through of overcharges include: (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic. All of these factors were present in the CRT market during the class period. The precise amount of such an impact of the prices of products containing CRTs can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution.

80. Plaintiff and other indirect purchaser class members have been forced to pay supra-competitive prices for televisions and monitors containing CRTs. These inflated prices have been passed on to them by direct purchaser manufactures, distributors, and retailers. Those overcharges have unjustly enriched defendants.

## V.   CLASS ACTION ALLEGATIONS

81. Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following class (the nationwide class"):

> All persons and entities residing in the United States which, from January 1, 1998 through and including November 9, 2007, indirectly purchased in the United States, for their own use and not for resale, a CRT which was manufactured and or sold by one or more of the defendants. Specifically excluded from this class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded area any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

82. Plaintiff also brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and or respective state statute(s), on behalf

of all members of the following classes or subclasses (collectively, the "Indirect Purchaser State Classes"):

      a.   **CALIFORNIA:** All persons and entities in California who indirectly purchased CRTs manufactured and or sold by one or more of the defendants during the class period for their end use and not for resale. Specifically excluded from this class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Class").

      b.   **MINNESOTA:** All persons and entities in Minnesota who indirectly purchased CRTs manufactured and or sold by one or more of the defendants during the class period for their end use and not for resale. Specifically excluded from this class are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Class").

83. Plaintiff does not know the exact size of the classes at the present time. However, Plaintiff Patrick believe that due to the nature of the trade and commerce involved, there are at least thousands in each separate state class, and hundreds of thousands of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

84. Plaintiff's claims are typical of the claims of their respective classes, and Plaintiff Patrick will fairly and adequately protect the interests of the classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of their respective classes.

Plaintiff has retained competent counsel experienced in class action and complex antitrust and consumer protection litigation.

85.  Common questions of law and fact exist, including:

a.  Whether defendants and their co-conspirators engaged in a contract, combination or conspiracy among them to fix, raise, maintain or stabilize the process of, or allocate the market of CRTs sold in the United States;

b.  The duration and extent of the contract, combination or conspiracy;

c.  Whether defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged herein;

d.  Whether defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman act;

e.  Whether defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold in and or distributed in the United States;

f.  Whether defendants and their co-conspirators engaged in conduct in violation of the antitrust, consumer protection, unfair trade and or deceptive trade practices laws of the various indirect purchaser states as alleged below.

g.  Whether the anticompetitive conduct of the defendants and their co-conspirators caused prices of CRTs to be artificially inflated to non-competitive levels;

h.  Whether the defendants and their co-conspirators unjustly enriched themselves because of their inequitable conduct at the expense of the class members;

i.  Whether defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct.

j.  Whether Plaintiff Patrick and the classes are entitled to injunctive relief; and

k.  Whether plaintiff and other members of the indirect purchasers' classes were injured by the conduct of defendants and, if so, the appropriate measure of damages for each of the classes.

86.  These and other questions of the law and fact are common to the classes and predominate over any question affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

87. Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a. It will avoid a multiplicity of suits and consequent burden on the courts and defendants;

b. It would be virtually impossible for all class members to intervene as parties-Plaintiff Patrick in this action;

c. It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d. It is appropriate for treatment on a fluid recovery basis, which obviate any manageability problems; and

e. It will provide court oversight of the claims process, once defendants' liability is adjudicated.

88. The named Plaintiff Patrick will fairly and adequately protect the interest of the class in that the named Plaintiff Patrick have no interests antagonistic to the interests of the other class members, and have retained counsel competent and experienced in the prosecution of class actions and antitrust cases to represent himself and the class.

89. This case is also appropriate for certification as a class action because the defendants have acted and refused to act on grounds generally applicable to the class, so that final injunctive relief will be appropriate with respect to the class as a whole.

90. The claims asserted herein are also appropriate for class certification under each of the states under which claims are asserted.

## VI.   FRAUDEULENT CONCEALMENT

91. Plaintiff and class members alleged herein did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspiracy. Because defendants' agreement, understanding and conspiracy were kept secret, Plaintiff Patrick and class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs and the products in which they were used.

92. The affirmative acts of the defendant alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

93. By its very nature, defendants' price-fixing conspiracy was inherently self - concealing. As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement.

94. Because of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that Plaintiff Patrick and the class members have because of the anticompetitive conduct alleged in this complaint.

95. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

96. Beginning at a time currently unknown to Plaintiff Patrick, but at least as early as January 1,1997, and continuing through November of 2007, the exact dates being unknown to Plaintiff Patrick, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and televisions and monitors containing CRTS sold in the Untied States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

97. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a. Fixing, raising, stabilizing, and pegging the price of CRTs; and

b. Allocating among themselves and collusively reducing the production of CRTs;

c. The combination and conspiracy alleged herein has had the following effects, among others;

d. Price competition in the sale of CRTs has been restrained, suppressed and or eliminated in the United States;

e. Prices of CRT sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

f. Those that purchased CRTs directly or indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

98. Plaintiff and other nationwide class members have been injured and will continue to be injured in their businesses and property by paying more for CRTs purchased indirectly from defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for televisions and monitors in which CRTs are included, because of higher prices paid for CRTs by the direct purchasers of CRTs.

99. Plaintiff and other nationwide class members are entitled to an injunction against defendants, preventing and restraining the violation alleged herein.

## Second Claim for Relief
## (Unjust Enrichment and Disgorgement of Profits)

100. Plaintiff alleges and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

101. Defendants have been unjustly enriched through overpayments by Plaintiff Patrick and class members and the resulting profits.

102. Under principles of unjust enrichment which exist in every state, defendants should not be permitted to retain the benefits conferred via overpayment by Plaintiff Patrick and class members.

103. Plaintiff and all members of the nationwide class seek disgorgement of all profits resulting form such overpayments and establishment of a constructive trust from which Plaintiff Patrick and class members may seek restitution.

## Third Claim for Relief
## (Violation of State Antitrust Laws)

104. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

105. Defendants' intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price-fixing itself was intended to and did cause plaintiff to pay supra-competitive prices for CRT prices charged for consumer products containing CRTs in the indirect purchaser states

106. Defendants' monopolistic and anticompetitive acts as described above violated the following antitrust statutes:

Defendants' have violated California Business and Professional Code § 16720, *et seq.*
Defendants' have violated Minnesota Statutes § 325D.51 *et seq.*

107. Plaintiff and the indirect purchasers classes in states with statute antitrust statutes listed above seek actual damages for their injuries caused by these violations in amount to be determined at trial.

108. Plaintiff and the indirect purchasers classes in states with statute antitrust statutes listed above further seek treble damages and attorneys' fees pursuant to the indirect purchaser states' antitrust laws as stated above to the extent allowed by law.

109. Plaintiff and the indirect purchasers classes in states with statute antitrust statutes listed above further seek attorneys' fees and costs pursuant to the indirect purchaser states' antitrust laws as stated above to the extent allowed by law, due to defendants'

### Fourth Claim for Relief

### (Violation of California Unfair Competition Law

110. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

111. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the California Business & Professional Code § 17200, *et seq.*

112. Plaintiff and the California class seek restitution and disgorgement of defendant's unlawfully obtained profits for their injuries caused by these violations, in an amount to be determined at trial.

113. Plaintiff and the indirect purchasers' class in California seek attorney's fees due to defendants' willful and unlawful conduct where allowable by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Patrick prays:

A.    That the court determine that the Sherman Act, California and Minnesota antitrust law, and California unfair competition law claims alleged herein may be maintained as class actions under Rules 23(a), (b)(2) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws.

B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged an decreed to be:

CLASS ACTION COMPLAINT - 22

1. A restraint of trade or commerce in violation of Section 1 of the Sherman act, as alleged in the first claim for relief;

2. Acts of unjust enrichment as set forth in the second claim for relief;

3. An unlawful combination, trust, agreement, understanding and or concert of action in violation of the California and Minnesota antitrust laws identified in the third claim for relief; and

4. A violation of the California Unfair Competition Law as alleged in the fourth claim for relief

C.     On the first claim for relief , that defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.;

D.     On the second claim for relief, that Plaintiff Patrick and the members of the nationwide class recover the amounts by which the defendants have been unjustly enriched because of their unlawful conduct;

E.     On the third claim for relief, the Plaintiff Patrick and the members of the California and Minnesota classes recover damages, to the maximum extent allowed under such laws as provided by the state antitrust laws listed above, and that a joint and several judgment in favor of Plaintiff Patrick and these classes be entered against the defendants in an amount to be trebled to the extent permitted by such laws.

F.     On the fourth claim for relief, that Plaintiff Patrick and the members of the California class be awarded restitution, including disgorgement of profits obtained by defendants because of their acts of unfair competition and acts of unjust enrichment;

G.     The Plaintiff Patrick and the members of each of the classes listed herein be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.    That Plaintiff Patrick and the members of each of the classes listed herein recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

I.    That Plaintiff Patrick and the members of each of the classes listed herein have such other, further, and different relief as the case may require and the court may deem just and proper under the circumstances.

Dated:  12 6 08                   By:   _Reginald Terrell_

DONALD AMAMGBO, ESQ.
AMAMGBO & ASSOCIATES
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone:  (510) 615-6000
Facsimile:  (510) 615-6025

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
223 25th Street
Richmond, California 94804
Telephone:  (510) 237-9700
Facsimile:  (510) 237-4616

*Attorneys for plaintiff*

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff respectfully demands a trial by jury.

Dated:   1|26|08                    By: _Reginald Terrell_
                                         DONALD AMAMGBO, ESQ.
                                         AMAMGBO & ASSOCIATES
                                         7901 Oakport Street, Suite 4900
                                         Oakland, California 94621
                                         Telephone: (510) 615-6000
                                         Facsimile: (510) 615-6025

                                         REGINALD TERRELL, ESQ.
                                         THE TERRELL LAW GROUP
                                         223 25th Street
                                         Richmond, California 94804
                                         Telephone: (510) 237-9700
                                         Facsimile: (510) 237-4616

                                         *Attorneys for plaintiff*